## CRABTREE v. CRABTREE.

### Opinion delivered June 26, 1922.

1. DIVORCE—SINGLE ACT OF CRUELTY.—Where a single act of physical violence is relied on for divorce, under Crawford & Moses' Dig., § 3500, as cruel and barbarous treatment, the evidence must show that the life of the complaining party was endangered.

2. DIVORCE—CRUELTY.—Where a wife, without warning, attempted to cut her husband's throat, and did cut a gash five inches long, and, on his running away from her, followed him and cut his hand severely while he was trying to hold a door between them, his injuries confining him to the hospital for 10 days, he was entitled to a divorce on the ground of cruelty.

3. DIVORCE—DISCRETION IN GRANTING ABSOLUTE OR LIMITED DIVORCE.—Under Crawford & Moses' Dig., § 3500, providing that the chancery court may, for causes enumerated, set aside a marriage contract, not only from bed and board, but from the bonds of matrimony, the discretion of the chancellor is not one to be exercised at his will, but is a judicial discretion to be exercised according to equitable principles and the peculiar circumstances of each case.

4. DIVORCE—GRANT OF LIMITED DIVORCE—ABUSE OF DISCRETION.—Where, in an action by a husband for divorce for cruelty, the chancellor found that plaintiff was without fault, and that defendant was guilty of cruelty, the chancellor abused his discretion in granting a limited divorce, instead of an absolute one.

5. DIVORCE—CUSTODY OF CHILDREN.—In a husband's action for divorce in which he established the ground of cruelty, it was not error to give to the mother the custody of two children, one nine and the other six years old, where they were being properly cared for by her.

Appeal from Sebastian Chancery Court; *J. V. Bourland;* Chancellor; reversed.

### STATEMENT OF FACTS.

Marvin M. Crabtree brought this suit in the chancery court against Josephine Crabtree to obtain an absolute

divorce from her. He also asked for the custody of their two children.

His ground for divorce was, that his wife had been guilty of such cruel and barbarous treatment as to endanger his life.

According to the plaintiff's testimony, his wife and himself lived with her mother, and he tried to persuade his wife to leave there and establish a home of their own. He did this because his wife's mother meddled with their marital affairs and made their home life with her unpleasant. On the day in question in this case, his wife's mother accused him of doing things that he had never thought of doing. He went back to his work at noon and returned home about six-thirty or seven p. m. After eating supper he started to go down town. His wife and the children came out of the house with him. He advised his wife that he was not going to live there in a continual row on account of her mother. His wife requested him to come back into the house, and he did so. Shortly after returning to the house, the telephone rang and one of his drivers asked him to come to the office. He told his wife that he had to go to town, and why. He told her she could go with him if she wished. The car was something like 200 feet from the house, and his wife had the switch-key. He was accustomed to turn the switch with a piece of metal on his key-ring. He walked in front of the car and set the crank to start the motor. At this time his wife stepped up behind him and laid her left hand on his left shoulder. She asked him if he would come back, and he replied that he was not making any promises. At this instant his wife cut his throat with a razor. He jerked loose from her and jumped over a big gate. Then, seeing a light in the rear of McCann's residence, about 100 feet away, he hastened there for help, and his wife followed him. He saw her coming, and she showed that she had not accomplished her purpose. He had to act quickly. He grabbed a swinging door and tried to keep

her from getting to him by holding the swinging door with his hand. His fingers stuck out on the side of the door next to his wife, and when she could not push the door open she slashed his hands, cutting four fingers on one and one finger on his other hand, practically severing the leaders in all of them. The cut in his throat was five inches long. He then turned loose the door and ran through the house into the kitchen, where McCann was sitting, and called his attention to what had just happened to him. His wife entered the room, and McCann caught her from behind and held her by the arms. His wife made two desperate attempts to assault him again, but was prevented by McCann. He grew very weak from loss of blood. Finally he sat down on the porch in a swing. His wife begged McCann to let her get to him. She got a little closer to him and struck at him again, hitting him across the face, but by some means the razor turned and only peeled the skin. He then started to run. His wife jerked loose from McCann and slashed him in the back, cutting three holes in his coat. She caught him, and all three of them fell on the floor. Mr. Shaffer came up at this time, and the plaintiff was released. Finally he started off of the porch and his wife ran at him, striking at him with the razor. Shaffer caught her. The plaintiff then got into his car and requested a man to drive him to the hospital. He was in the hospital ten days. The day after he left the hospital his wife called him over the telephone and said, "Well, good morning, old scout, how are you?"

Mrs. Crabtree was a witness for herself. According to her testimony she did most of the ironing and washing for the family, made most of the children's clothes, did the household work, and mowed the yard. When she had spare time she worked in her husband's place of business.

She claimed that her husband was of a sullen disposition and mistreated her in various ways, which she stated. She admitted cutting him on the occasion in

question. When her husband was called to his office over the telephone that night, she asked to go with him, and he replied that she could. She went to the sideboard to get the switch-key to give to her husband. She had on an apron, and dropped the switch-key in one of its pockets. When she got to the car she put her hands in her pocket to get the key, and felt the razor. She had been using it that day in ripping some of her children's clothes. She does not recall anything from the time she felt the razor in her pocket until some time after the assault on her husband was made. She supposed she attempted to cut her husband's throat with the razor, but had no recollection of it.

The plaintiff denied that the defendant was compelled to do any ironing and washing, and stated that the washing had been hired to be done for five years. He admitted that his wife sometimes mowed the yard, but not at his request. He said that he did not want to live with her people, and constantly tried to get his wife to move to another house, but she refused to do so. He denied categorically that he had ever mistreated his wife in any way.

By agreement of counsel, certain evidence which had been used in the trial in the circuit court on the charge against his wife for assault with the intent to kill her husband was made a part of the record in this case.

J. A. McCann was one of the witnesses. He told about the wife following her husband to his house with a razor in her hand. He held her about twenty minutes while she struggled to get away. She appeared very nervous and struggled to get free from him. She had a wild look in her eyes and stared into vacancy. In his opinion she was temporarily insane.

Several witnesses who saw her later in the evening and on the next day testified that she did not appear normal and was very nervous and had a peculiar look. They said that she had always been a peaceable woman

before that time, and they regarded her as temporarily insane when she attacked her husband with the razor and cut his throat.

On the day of the final hearing, the defendant testified that she wanted the plaintiff to become reconciled to her and that she was willing to do anything to bring about a reconciliation. The plaintiff was questioned by the court and said that he would not live with the defendant again; that her assault upon him was without provocation, and that he would not risk his life by living with her again.

The chancellor entered a decree of divorce from bed and board in favor of the plaintiff against the defendant, but refused to grant him an absolute divorce. Their two children were awarded to the custody of the defendant, and the parties settled their property rights by agreement.

The plaintiff has duly prosecuted an appeal to this court:

*Earl U. Hardin* and *Webb Covington*, for appellant.

HART, J. (after stating the facts). What constitutes a cause of divorce is a matter of law. Whether such conduct exists is a matter of fact to be proved by competent evidence. One of the grounds for divorce under our statute is where either party shall be guilty of such cruel and barbarous treatment as to endanger the life of the other. Sec. 3500 of Crawford & Moses' Digest.

While a single act of physical violence does not always justify a divorce under the statute, still it may be of such violence and danger to the life of the complaining party as to constitute a ground of divorce. Much depends upon the character of the violence and upon the presence or absence of provocation. A serious blow given intentionally and without any provocation will generally give rise to the inference that it is likely to be repeated and thus create a reasonable apprehen-

sion of danger for the future. The evidence must show that the life of the complaining party was endangered.

The question was discussed at length in the case of *De Coito* v. *De Coito*, 21 Hawaii, 339. It was there held that to constitute extreme cruelty there must be such violence or such a course of conduct as tends to endanger life, limb, or health, or create a reasonable apprehension of such result, thus rendering continued cohabitation unsafe.

In *Ford* v. *Ford*, 104 Mass. 198, it was held that where the evidence relied on is that of blows given on a single occasion, the violence must be of such a character as to endanger life, limb, or health, or as to create a reasonable apprehension of such danger.

In *Beyer* v. *Beyer*, 50 Wis. 254, it was held that a single assault and battery constitutes cruelty when committed under circumstances which indicate that the defendant has so little control over his passions that he will be likely to repeat personal violence on any provocation.

In *May* v. *May*, 62 Pa. 206, the court held that a single act of cruelty may be so severe and attended with such corresponding circumstances of atrocities as might, under a fair and liberal construction of the act, justify a divorce. But the court said that no single act of cruelty, however severe, that comes short of endangering life, is sufficient to justify a divorce.

As we have said, our statute names as one of the causes for divorce that either party shall be guilty of such cruel and barbarous treatment as to endanger the life of the other.

While the chancellor did not grant an absolute divorce, still he found the facts for the plaintiff and granted him a divorce from bed and board on the ground that he had the power to grant either kind of divorce under the statute on the same testimony.

It cannot be said that the finding of facts made by the chancellor is against the weight of the evidence.

The husband testified that his wife, without warning, attempted to cut his throat and did cut a gash in it five inches long. He ran away from her, and she followed him to a neighbor's house, where she severely cut his hand while he was trying to keep away from her by holding a door between them. Even after the neighbor caught hold of her, she made repeated attempts to again cut her husband with the razor. She cut him in the back as he ran away from her. His injuries were so severe that he was confined for ten days in a hospital. He made no attempt whatever to strike his wife or in any way to injure her. He merely tried to run away from her.

The husband's testimony is corroborated by that of the neighbor to whose house he ran to escape from his wife. Indeed, the wife admits the cutting, and only seeks to excuse it on the ground that her reason was temporarily dethroned. She introduced witnesses who testified to that fact. However, they all described her appearance, and it is fairly inferable from the surrounding circumstances that she attacked her husband in a sudden fit of anger. In any event, her attack was so severe that she endangered his life, and it would seem that under the circumstances he is justified in not living with her again. There was but little, if any, provocation for the assault.

It is true that the wife testified in a general way about indignities suffered by her at the hands of her husband, but he specifically denied any ill treatment of her, and said that whatever marital troubles they had arose from the fact that she would not live away from her mother in a home which he offered to prepare for her. It was her duty to live with her husband, and the circumstances attending the assault do not show any provocation for it.

Hence we cannot say that the finding of fact made by the chancellor in favor of the plaintiff is against the preponderance of the evidence.

It appears from the record, however, that the chancellor refused to grant an absolute divorce to the plaintiff, not because he was not entitled to such a divorce under the facts, but because the chancellor believed that under the statute he had a right to grant an absolute or limited divorce upon the same testimony as he might deem proper.

In this respect we think the learned chancellor erred. It is true that § 3500 of Crawford & Moses' Digest provides that the chancery court shall have the power to dissolve and set aside a marriage contract, not only from bed and board, but from the bonds of matrimony, for the causes specifically enumerated in the statute. This, however, does not mean a discretion to be exercised at the will of the chancellor; but it is a judicial discretion to be exercised according to equitable principles and the peculiar circumstances of each case.

The subject was thoroughly discussed by Judge FIELD, while a member of the Supreme Court of California, in the case of Conant v. Conant, 70 Am. Dec. 717. The statute construed in that case provides that the several district courts of the State shall have exclusive jurisdiction to grant a divorce from bed and board and from the bonds of matrimony. Wood's Digest of the Laws of California, Art. 2635.

It will be noted that the statute, in so far as it relates to the discretion of the court in granting an absolute or limited divorce, is substantially the same as our statute. In that part of the decision bearing on this question, the learned justice said:

"The statute says divorces may be granted from bed and board, or from the bonds of matrimony, but it was never intended that either should be indifferently granted, according as the prayer of the applicant asked for one or the other modes of relief. It was intended that a certain discretion should be exercised by the courts, according to the special circumstances of each suit, acting upon the settled principles of the common

law as applicable to this class of cases. And the true
rule which should govern the court in the exercise of
its discretion in this respect is this, that, to entitle to
a decree for an absolute divorce from the bonds of matri-
mony, the applicant must be an innocent party—one who
has faithfully discharged the obligations of the marriage
relation, and seeks relief because really aggrieved or
injured by the misconduct of the other; and, on the other
hand, where there are circumstances showing a disre-
gard of those obligations, though not carried to such a
degree as to constitute itself a ground for divorce, the
decree should be only for a divorce from bed and board.
To obtain a release *a vinculo matrimonii,* the applicant
must be without reproach, and, however guilty the de-
fendant, if the applicant is chargeable either with similar
guilt or an offense to which the law attaches similar con-
sequences, the relief must be denied; and if the applicant,
though not thus guilty, is still not blameless, the relief
must be limited to a divorce *a mensa et thoro.''*

But it is claimed that this decision is contrary to
the rule laid down in *Crews* v. *Crews,* 68 Ark. 158. In
that case the chancellor granted the defendant on her
cross-complaint a divorce from bed and board, and in
discussing the question Chief Justice BUNN said:

''The decree from bed and board and the divorce
from the bonds of matrimony both rest upon the same
ground, and the same evidence will sustain either, with
this qualification: Upon the evidence the chancellor
has a sound discretion to grant the one kind of divorce
or the other as he may deem best under the circumstances.
The text writers generally, and many jurists, declaim
against divorces from bed and board as useless, if not
absolutely wrong in principle, but we cannot enter upon
a discussion like that. The law authorizes divorces of
that kind, and the implication, at least, is that circum-
stances must determine when they should be granted.
The chancellor has exercised his discretion, and we can-

not say that his discretion has been abused. His decree is therefore affirmed.''

A majority of the court is of the opinion that the rule laid down in that case is in accordance with and not contrary to the principles announced by Justice FIELD. Every opinion must be construed with reference to the facts under discussion.

In *Crews* v. *Crews, supra,* the chancellor found that both parties were to a degree in fault, and that neither was entitled to an absolute divorce, but that a decree of divorce from bed and board should be rendered. It was contended by counsel that this finding was tantamount to a finding that both parties were equally at fault, and that therefore neither was entitled to a divorce. This court said that it did not think that the language of the chancellor had that meaning, but rather that, while neither was blameless, there was a difference in their guiltiness in degree.

The language quoted above shows that this constituted the basis of the affirmance of the decree of the chancery court. It will be noted that the court said that the decree from bed and board and an absolute divorce rests upon the same ground, and that the same evidence will sustain either, with a qualification.

The qualification was that the chancellor has a sound discretion to grant the one kind of divorce or the other, as he may deem best under the circumstances. The circumstances under which the chancellor exercised his discretion in that case were, as we have already seen, that both parties were to a degree in fault, and on that account neither was entitled to an absolute divorce. The defendant was granted divorce from bed and board because the chancellor deemed that she was the less guilty of the two parties. It will be seen from the language quoted that this court will reverse the chancellor where he abuses his discretion in the matter. If the chancellor had the right to grant an absolute or limited di-

vorce indifferently, it is plain that he could never abuse his discretion.

On the other hand, if his discretion is to be exercised according to the principles expressed in *Conant* v. *Conant, supra,* and in accordance with the acts of the chancellor in *Crews* v. *Crews, supra,* it is manifestly an abuse of discretion for the chancellor to grant a divorce from bed and board where the complaining party is without fault and has established his or her grounds for divorce.

Therefore, the chancellor, having found the facts in favor of the plaintiff, abused his discretion in refusing to grant him an absolute divorce, and in granting him a divorce from bed and board.

The property rights of the parties arising from the marital relations were settled by agreement, and that phase of the case is not before us.

Complaint is also made by the plaintiff that the court erred in not granting him the custody of their two children. The court granted the custody of the children to the mother with the right of visitation to the father. One of the children was a boy, age six, and the other a girl nine years old. While the plaintiff asked for the custody of the children, he does not assign any reason why he should have them, and the court can perceive none. It does not follow that, because the wife tried to kill him in a fit of anger, she did not have any parental affection for the children. On the contrary, the record discloses that she loved them and was properly caring for them. The court looks mainly to the comfort and happiness of the children and gives them to the keeping of that parent who can best look after them.

On account of their tender years, it cannot be said that the chancellor erred in giving them to the custody of the mother, with the right of visitation to the father at all proper and reasonable times. Therefore, the decree in this respect will be affirmed.

It follows from the views expressed above that the chancellor erred in not granting an absolute divorce to the, plaintiff, and for that error the decree will be reversed and the cause remanded, with directions to grant him an absolute divorce.

HUMPHREYS, J., (dissenting). After a careful reading of the facts in this case, my conclusion is that the attack made upon appellant by appellee was due to temporary insanity. They had lived together for a number of years in peace and harmony. No serious friction existed between them at the time the attack was made. The infliction of the injuries was an isolated act of cruelty, out of keeping with the current of their lives, and without excuse upon any other theory than momentary insanity. The undisputed evidence tended to show that appellee was beside herself, when she so unexpectedly and viciously attacked her husband. She herself testified that she knew nothing of the occurrence until it was all over. The evidence is wanting to show intentional cruelty, so a decree of divorce should have been refused.

I also think the majority have incorrectly construed the statute and, in effect, overruled the case of *Crews* v. *Crews,* 68 Ark. 158. In that case the divorce statutes were interpreted as conferring a sound discretion upon the chancellor to determine whether a divorce absolute, or from her bed and board only, should be granted in any particular case. The effect of the majority opinion in the instant case is to withdraw that power from the chancellor.

For the reasons given, I am impelled to dissent from the majority opinion.