GIBSON v. GIBSON.

5-2437                                              356 S. W. 2d 728

Opinion delivered April 2, 1962.

[Rehearing denied May 28, 1962.]

*W. H. Howard* and *Wm. S. Arnold* of *Arnold & Hamilton,* for appellant.

*John F. Gibson,* for appellee.

NEILL BOHLINGER, Associate Justice. The appellee herein filed his complaint in the Chicot Chancery Court in which he sought a divorce from the appellant, Sarah Gibson, on the grounds of general indignities and asked that the two adopted children of the parties be awarded to him and that the appellant take no part of his property. Subsequently appellee amended his complaint and alleged that the appellant had attempted to destroy and invade his personal dignity; was suspicious and jealous of his friends; persistently quarreled; fussed, abused and nagged him; exhibited manifest hatred; was devoid of concern for his business and prohibited the appellee from administering his business; required unreasonable explanations of his business and social activities; and had neglected personal supervision of his two children.

To this complaint appellant filed an answer denying the specific allegation of indignities; denying she was not a fit and proper person to have the custody of the children; denying that she had failed to maintain the home; asking that the complaint be dismissed; and asking for support for herself and children, costs and attorney's fees and for permission to file a cross complaint if on examination it was found necessary; and asked for all equitable relief.

Thereafter the appellant filed her amended answer and cross complaint alleging that the appellee herein had treated her with contempt and neglect, had shown a propensity for preferring the company of other women that caused her mental and physical strain through no fault of her own and asked for separation of bed and board. She further alleged that any conduct complained of by appellee was brought on by appellee's own action and that she was without means of support. In addition to asking for separation from bed and board, in the alternate she asked an absolute decree of divorce and for her property rights.

Responding to a motion by the appellee, the appellant filed an amended and substituted counterclaim with interrogatories and in that pleading reaffirmed and re-

adopted her former pleadings and made further allegations that the appellee's course of conduct displayed an attitude of contempt and neglect; that he had privately and publicly abused and cursed her name and reputation; that he had continually associated with other women, indicating improper or immoral conduct; that the appellee had on numerous occasions appeared in public intoxicated; that he had committed one or more acts of adultery prior to the filing of his complaint and she alleged appellee was guilty of acts of adultery.

Further, that appellee had refused a reconciliation which she was willing to accept and that the counterclaim was made for the purpose of protecting her rights in appellee's property and that if the court determined an absolute divorce should be granted, that such divorce be granted to her and asked for her statutory rights in appellee's property and for such other relief as she might be entitled to and that her pleadings be deemed amended to conform to the proof.

After numerous delays and a lengthy trial, the court awarded to the appellee an absolute divorce and awarded temporary custody of the children to the appellant with right of visitation in the appellee and required the appellee to pay $500.00 per month temporary support. The chancellor, in his finding, took the view that the position of the appellant would have been better taken had her plea been for an absolute divorce and if the chancellor, in his discretion, finds absolute divorce not be granted then a limited divorce be granted; that the court could not grant an absolute decree when a limited divorce was prayed. The chancellor further found that appellee's charge of fussing and nagging, use of profanity toward appellee and the use of profanity in the company of others, a closet incident, use of detectives to shadow him and charging appellee with adultery had been corroborated.

The chancellor found that the appellant's allegation of the appellee removing himself from the marital bed, desire for party life to the exclusion of family life,

requiring her to associate with obnoxious friends, contemptuous behavior toward her, fussing and nagging, cursing her, had not been sufficiently corroborated and had been explained away; that the appellant had failed to prove the charge of adultery and that the allegation and subsequent failure to prove this charge was the basis for a finding that the appellant's charge constituted cruel treatment. He further found both parties had the same grounds for personal indignities, but that the appellant had failed to prove the charge of adultery. The court found her action in hiring detectives to shadow the appellee was a cause of the separation and that the decree therefore should be awarded to the appellee.

The chancellor, in his finding, took the position that the appellant could not be granted an absolute decree of divorce as her application was for a limited divorce. We do not so read the record. In her answer and cross complaint the appellant asked for separation of bed and board and in the alternative asked for an absolute decree and for her property rights. We think the case of *Grytbak* v. *Grytbak*, 216 Ark. 674, 227 S. W. 2d 633, is applicable here. In that case we said:

"We have held that the statement of facts in a complaint or cross complaint and not the prayer for relief constitutes the cause of action and that the court may grant whatever relief the facts pleaded and proved may warrant in the absence of surprise to the complaining party."

In this case there was no surprise nor does the appellee plead surprise.

Not only did the prayer of the answer and cross complaint ask, among other things, an absolute decree but the facts as pleaded and proved would entitle the appellant to that relief. See also *Crabtree* v. *Crabtree*, 154 Ark. 401, 242 S. W. 804. While the *Crabtree case* deals with the matter of judicial discretion when deciding whether the pleadings are adequate to award an absolute or limited divorce, we stated in that case:

"" * * * This, however, does not mean a discretion to be exercised at the will of the chancellor; but it is a judicial discretion to be exercised according to equitable principles and the peculiar circumstances of each case. * * *""

"On the other hand, if his discretion is to be exercised according to the principles expressed in *Conant* v. *Conant, supra,* [70 Am. Dec. 717] and in accordance with the acts of the chancellor in *Crews* v. *Crews, supra,* [68 Ark. 158] it is manifestly an abuse of discretion for the chancellor to grant a divorce from bed and board where the complaining party is without fault and has established his or her grounds for divorce." [Citations added]

We hold that the pleadings of the appellant are not so limited as to preclude the granting to her of an absolute decree.

In the matter of the personal indignities alleged by both parties, the chancellor made this finding:

"Summarizing, the plaintiff charged the defendant with personal indignities, and the defendant charged the plaintiff with personal indignities and adultery. The plaintiff sustained the grounds of personal indignities, the defendant sustained the grounds of personal indignities, but failed to prove the charge of adultery. The court following the rule of comparative rectitude finds that becase the defendant failed to prove the charge of adultery and her action in employing detectives to 'shadow.' the plaintiff was the ultimate cause of the separation, that the divorce should be granted the plaintiff."

There was no appeal by the appellee from the chancellor's finding that the appellant had sustained the grounds of personal indignities alleged by her. After a careful perusal of the many hundreds of pages of the record in this case, we reach the conclusion that the appellee failed to prove his general charge of indignities in such a manner as would have entitled him to a divorce. Indignities may mean a number of things in various circumstances but in order to constitute the

grounds for divorce they must be constantly and persistently pursued with the object and effect of rendering the situation of the opposing party intolerable.

Perfection is the ultimate goal in all fields but we doubt if perfection in the field of human relations has ever been or will ever be attained. It is hardly conceivable that over a period of years two separate and distinct persons can live their lives as intimately enmeshed as in the marital relation without friction and rare would be the history of a marriage where no clash of opinions, ideas and wishes have ensued. Colorless indeed would be the life of any strong willed pair if either party cast aside a personal preference in minor details and followed without remonstrance the dictates of the stronger of the two. We might, in such a circumstance, have a semblance of peace but we would not attain the degree of felicity which the marital state contemplates.

We do not find that the appellant has in all respects been gentle and yielding nor willing to subject her inclinations and preferences to the more boisterous activities of the appellee and in some respects her fears and apprehensions for him may have been a source of annoyance to him but we fail to find a studied neglect or the indignities that must be habitually and systematically pursued for the purpose of rendering her mate's station in life intolerable. In this case we have two people with different backgrounds and a clash of personalities that may never be resolved and the record before us convinces us that neither party to this action has displayed that tolerance and understanding that rests upon each party in a marriage contract if a marriage is to be preserved. In this respect they are both guilty. We therefore conclude that the appellee's allegations of indignities on which he predicates his prayer for divorce have failed.

In the matter of the charge of adultery. We know of no useful purpose that will be served in a page by page recital of the sordid details in this chapter of domestic infelicities. It is true, as the chancellor found, that the appellant placed the appellee under surveillance

by the employment of detectives, and the rumors that gave rise to her suspicions seem to have been well grounded. There was brought to light by their activities at least one episode in Hot Springs on which we must sustain the charge of adultery. We do not agree with the chancellor that the degree of proof necessary to establish adultery was lacking. Were this a criminal case we might share his view but this is a charge of adultery in a civil proceeding and that charge may be sufficiently proved by evidence of circumstances leading to an inference of guilt. The following cases are pertinent. *Leonard* v. *Leonard,* 101 Ark. 522, 142 S. W. 1133; *Buck* v. *Buck,* 207 Ark. 1067, 184 S. W. 2d 68; *Hargis* v. *Hargis,* 188 Ark. 1167, 67 S. W. 2d 597, and *Ayers* v. *Ayers,* 226 Ark. 394, 290 S. W. 2d 24.

The opportunity and the adulterous disposition must meet. The opportunity was present and while there is no person except the participants who know whether or not one or both of the parties involved harbored an adulterous disposition, the almost daily telephone calls between the appellee and the woman, his clandestine meetings with her, their demonstrations and their presence in a darkened motel room during the nighttime are such circumstances that would lead the guarded discretion of a reasonable and just man to the conclusion of guilt.

From the record in this case we conclude that the appellant has sustained her charge of adultery and is entitled to a decree of absolute divorce from the defendant.

The trial court was correct in awarding the temporary custody of the two children to the mother with visitation rights in the appellee. That order should stand until the court finds that the welfare of the children necessitates a change. The appellee will be required to furnish support money for the children.

In the matter of attorney's fees. We do not have before us the schedule of fees adopted by that local Bar but the allowance of $2,500.00 by the trial court does not

appear adequate and for that reason an allowance of an additional $1,500.00, which will cover the costs of this appeal, is made to the attorneys for the appellant and it will be paid by the appellee. At the conclusion of this cause on the remand the court will further examine the matter of additional allowances to cover the services of counsel for appellant in the final disposition of this cause.

The court will further ascertain the rights of the appellant in the property of the appellee and make the appropriate orders therein. This cause is reversed and remanded for further proceedings consistent with this opinion.

ROBINSON and JOHNSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting. The majority has reversed the decree of the trial court and ordered that appellant be granted a divorce on the ground of adultery, specifically holding that appellant is not entitled to a divorce on any other grounds.

All of the parties involved, including the appellee, the appellant, the lady with whom appellee is alleged to have had an affair, and the detectives hired to watch appellee, appeared before the trial court. The Chancellor had a much better opportunity than has any member of this Court to judge the credibility of the witnesses, and the Chancellor reached the conclusion that there had been no adultery. After carefully reviewing the entire record, I have reached the same conclusion.

The detectives who testified in the case were paid more than $6,000.00, almost $7,000.00, to watch the appellee, and they could tell of only one isolated instance of suspicious circumstances. Detectives from Memphis were also hired to watch appellee, but they were not called as witnesses. Apparently during the time they had appellee under surveilance they observed nothing of a suspicious nature. It does appear, however, that they went to appellee's pasture and counted his cattle. This was prior to the time the parties separated. There is no

showing as to the amount of money paid to the Memphis detectives.

There is a very strange and unusual occurrence in connection with this case—so out of the ordinary as to cast a deep shadow on appellant's contentions. Appellant undertook a campaign to get evidence of adultery on the part of her husband. In furtherance of plans in that respect detectives were hired. The record shows the hiring of Little Rock detectives, Memphis detectives, and perhaps detectives from Dallas and St. Louis, but the record does not reveal whether detectives were hired elsewhere.

Appellant testified that appellee was very liberal with her in money matters. She stated that she would bring home on approval dresses that cost $25.00 and others that cost $150.00 and appellee would tell her to keep the $150.00 dress. She testified: "As to the monthly support, all I had to do was ask Jack (appellee, her husband) and he would say spend it and he would worry about it. I do not know what the utilities are. I have never seen money spent as it is spent in this country and was not accustomed to it."

Appellant testified that she did not use her husband's money to pay detectives to watch him. She stated that Mr. Scroggins, who lives in Monticello, supplied the money to pay the detectives. It appears that she had not known Mr. Scroggins very long before she and her husband separated; that perhaps she and her mother had met Scroggins one time before at a deer camp, and that he had never been in the Gibson home before the separation. Appellant testified that she and her mother went to Mr. Scroggins and that her mother borrowed money on her property to conduct the investigation. It is not shown what property her mother owned or the value thereof. The mother, Mrs. Kendricks, did not testify in the case. Appellant testified that she personally received $55.10 per month from an insurance policy on the life of her first husband, and ever since her marriage to Gibson she had turned the insurance money over to

her mother because her mother needed it to live on. She testified that at the time the money was borrowed from Scroggins no arrangements were made as to any particular amount and that there was no due date. She testified that Scroggins and his wife drove her to Hot Springs on one occasion in connection with watching her husband. She stated that the detectives never sent her a statement for services and she did not know to whom the statements were sent.

Scroggins testified that he made a loan to Mrs. Kendricks, the mother of Mrs. Gibson, and to Mrs. Gibson; that a note was signed by both Mrs. Kendricks and Mrs. Gibson in his store in Monticello; that he advanced $5,600.00; that he did not know what the money he loaned was to be used for; that he had no other bills from Mrs. Gibson except a few telephone calls she had charged to his phone; that the only inducement for the loan was to make the interest, which was six per cent; that he first met Mrs. Kendricks at the Collins Hunting Club with Mrs. Gibson.

The Court sent Scroggins to get the note which he had stated Mrs. Kendricks and Mrs. Gibson signed. Scroggins brought back a note that was not signed by anyone. In other words, Scroggins, almost a stranger to Mrs. Kendricks and Mrs. Gibson having met them perhaps only one time at the Collins Hunting Club, had loaned almost $6,000.00 without the scratch of a pen to have Mrs. Gibson's husband watched with the idea of being able to make out a case of adultery against him. It is small wonder that the Chancellor did not place much stock in testimony obtained under the circumstances shown here.

On the other hand, the party with whom it is alleged that appellee had an affair, faced her accusers in open court before the Chancellor, who had the opportunity to see her and observe her demeanor on the witness stand, under direct and cross examination, and concluded that she testified truthfully when she said she was guilty of no immorality.

I respectfully dissent from the finding that appellee is guilty of adultery. I do not reach the point of whether the evidence is sufficient to sustain the awarding of a divorce to the appellee.

JIM JOHNSON, Associate Justice, dissenting. I agree with everything said by Justice Robinson in his dissent but would add that t he detectives, who were well paid witnesses in this case, after over two years of almost constant surveillance could find but one isolated instance which was the least bit suspicious. The majority refers to this instance in the following language: "We know of no useful purpose that will be served in a page by page recital of the sordid details in this chapter of domestic infelicities." The truth from the record is that there are no *sordid details*.

When appellee learned of appellant's apparent efforts to entrap him by having his every move watched by detectives he was so embarrassed and humiliated in his home community that he separated from appellant.

During the next two years before trial, he was aware of the almost constant surveillance under which appellant's detectives kept him. Defamatory gossip was spread on behalf of appellant's contentions to such an extent that it appeared to be the talk of the town. Under oath on the witness stand the gossip proved to be unfounded. The one person who could testify to the true facts concerning the apparent conspiracy which appellant had promoted against appellee for the purpose of personal enrichment was the very person appellant chose to accuse of being the major adulteress with her husband.

This young lady had for a long period of time been the best and most confidential friend of appellant. Appellant had confided in this friend that she was going to fix appellee, that she had one adopted child and intended to get more and soak him for everything he had. There was proven to my satisfaction continuous indignities too numerous to mention, some of which were repulsive, committed by appellant which would render appellee's condition intolerable. From the whole record I

cannot escape the conclusion that the confidential friend aptly stated the case when she said, as abstracted, that "appellant missed her calling. She should have been an actress. I think she is putting on a good act. This whole thing is a scheme and has been in process for eight years, been planning what she would do to appellee and I was a good scapegoat." Certainly appellee needed the testimony of this witness in order that his side of the question could be presented. This witness knew things, because of her confidential relationship to appellant, which would further corroborate appellee's testimony to the many indignities which were heaped upon him. Under the circumstances appellant was more than justified in his efforts to keep the good will of the witness. This necessitated his keeping in constant contact with the witness who could testify as to the truth of events which would prevent appellant's scheme from working. They don't deny that they met in Hot Springs. They both knew that detectives had been following them. They moved for a final showdown. They sought by their actions to explode appellant's balloon of suspicion. The motel incident was a part of the plan. The facts as related by the majority relative to this incident are strenuously disputed. Under the circumstances of the seemingly desperate and fanatic attempts of this appellant to ruin the lives of these two people, the explanation relative to the meeting in Hot Springs by appellee and the witness who had been living with her sister in Dallas was logical and understandable. The witness had been accompanied to Hot Springs by her sister and her family, and had over an extended length of time been kept under surveillance by appellant's detectives.

The learned Chancellor in his equitable handling of this case not only had the opportunity to view and judge the credibility of the parties in interest but was confronted with an array of the most prominent and credible men to be found in South Arkansas who testified without contradiction to the good character of appellee. It follows, from what has been said above, that I cannot from the cold printed page in good conscience say that the

decree of the trial court is against the weight of the evidence.

As to the attorneys' fees. It is apparent from the view of the majority that appellant's attorneys did a masterful job. Certainly they are entitled to every penny the majority has awarded them. My only disagreement with the majority on this point is that the money should be paid by appellant through the same source which for a period of over two years paid the hard working detectives who found the one suspicious incident upon which this case on appeal turned. To say the least, I am unable to agree with the picture of sympathy which was so ably presented of a young war widow who had lost two of her loved ones prior to her marriage to this appellee. The record is too plain that the loss had occurred some years before the marriage. If this appellant had been so grief stricken, I am at a loss to know why she would have been present at a notorious night spot here in Little Rock at the time she was introduced to appellee and why she was present on a trip to New Orleans for the Mardi Gras where the courtship of the two apparently blossomed. For these and other reasons in the record too numerous to mention, I respectfully dissent.